## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CITATION INSURANCE COMPANY
A/S/O PETER T. DAMORE,
*Plaintiff*,

v.

BROAN-NUTONE LLC AND JAKEL
MOTORS INCORPORATED,

*Defendants*.

Civ. No.: 4:21-cv-11707-MRG

## MEMORANDUM & ORDER ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT [ECF No. 23]

**GUZMAN, D.J.**

## I.    INTRODUCTION

This is a products liability case that arises within the context of an insurance subrogation action.  Plaintiff-insurer Citation Insurance Company dispensed approximately $726,379 in payments to its insured, Mr. Peter T. Damore, in the wake of a fire at Mr. Damore's home that damaged his real and personal property.  Now, Citation -- as subrogee of Damore -- has sued Defendant-bathroom exhaust manufacturer Broan-NuTone LLC, and Defendant-electric fan motor manufacturer Jakel Motors Incorporated on manufacturing defect and design defect theories, sounding in both negligence and breach of implied warranty.

Defendants have moved for summary judgment, arguing in the main that Plaintiff's expert cannot establish causation. More specifically, Defendants assert that summary judgment must enter

1

in their favor on the manufacturing defect claims due to Plaintiff's Engineer Expert's belated[1] identification of a manufacturing defect, and the expert's failure to conclude that said defect *caused* the fire. Defendants argue that they are entitled to summary judgment on the Complaint's design defect claims since Plaintiff's Engineer Expert belatedly[2] proposed alternative design modifications and could not definitively state that those modifications could be made without undue cost or interference with the performance of the bathroom exhaust fan.

On both scores, the Court agrees with the Defendants. After careful consideration, the Court **<u>GRANTED</u>** Defendant's summary judgment motion by electronic order on March 31, 2025. [ECF No. 30]. This Memorandum and Order provides the Court's factual findings and legal analysis that supported the grant of summary judgment in favor of Defendants.

## II.    <u>BACKGROUND</u>

### a.  <u>The Facts[3]</u>

#### i.    <u>The Insured's Property</u>

Plaintiff provided property insurance coverage to Mr. Damore for his property located at 29 Brookside Lane, Burlington, Massachusetts. [ECF No. 1 ¶ 3]. The insured's property was a multi-level, wood frame residence. [<u>See e.g.</u>, ECF No. 24-4 at 3].

---

[1] As discussed *infra*, Plaintiff's engineering expert did not disclose a sufficiently <u>specific</u> alleged manufacturing defect in either of his two expert reports but did attempt to do so in his deposition. [<u>See</u> ECF No. 24-5; ECF No. 24-6; Wald Dep. 113:4-116:4, ECF No. 24-7].

[2] As discussed *infra*, Plaintiff's engineering expert did not disclose any proposed and allegedly available design modifications until his deposition. [<u>See</u> ECF No. 24-5; ECF No. 24-6; ECF No. 24-7, 104:11-22, 114:5-116:1.

[3] Unless otherwise noted, the following facts are undisputed.

      **ii.**    **The Bathroom Exhaust Fan & its Motor**

Broan designed, manufactures, and sells a bathroom exhaust fan bearing the name, NuTone 763RLN (the "Fan").  [ECF No. 24 at 2].  The Fan contains an electric motor (the "Motor") that is designed, manufactured, and sold by Jakel.  [Id.]  Both the Fan and the Motor met the industry standard safety requirements promulgated by UL Solutions, Inc. ("UL"),[4] which required among other things that such motors have a mechanism for preventing overheating.  [ECF No. 24 at 2; ECF No. 24-7, 84:5-85:3].

The Motor featured a thermal cut off (a "TCO") which is a thermal fuse that is supposed to melt open when the Motor reaches a certain unacceptable temperature.  [ECF No. 24 at 2].  Mechanically speaking, when a TCO melts in this context, the electrical power flowing to the Motor is interrupted, allowing it to cool.  [E.g., ECF No. 25 at 3].  As Plaintiff's engineering expert explained at deposition, "if there is no TCO, then when the [M]otor gets hot, it can ignite a fire."  [ECF No. 24-7, 21:18-20].  The TCO leads are joined together by a fusible[5], eutectic[6] metal alloy that should melt at an acceptable temperature.  Here, The Fan and Motor were installed in Mr. Damore's home in 2005, [ECF No. 25 at 2], and were located in the ceiling of the home's primary bathroom.

---

[4] As another court has explained, UL "is a non-profit corporation that oversees the process of developing and updating standards…by convening a group of innovators, implementers, and other experts in a Standards Technical Panel (STP).  UL tests products and authorizes the manufacturer to use its certification mark to indicate a product complies with the applicable standard."  Warren Tech. v. UL LLC, 962 F.3d 1324, 1326 (11th Cir. 2020).

[5] According to the Oxford English Dictionary, the term "fusible cutout" has been defined as "a short piece of metal in circuit which melts when the current attains an unsafe magnitude."  *Fusible Cutout*, Oxford English Dictionary, https://www.oed.com/dictionary/fusible_adj?tl=true (last retrieved May 27, 2025).

[6] "Eutectic" has been defined as "[a] mixture which is distinguished from other mixtures of the same constituents in different proportions by having a single temperature at which it melts and freezes…"  *Eutectic*, Oxford English Dictionary, https://www.oed.com/dictionary/eutectic_adj?tab=meaning_and_use #5101178 (last retrieved May 27, 2025).

### iii. The Events of September 15, 2020 & Subsequent Insurance Claim

On September 15, 2020, Mr. Darmore was working on his computer on the first floor of his home. [ECF No. 24-4 at 4]. A technician employed by non-party Verizon was working in the basement, upgrading the home's WiFi[7] System. [ECF No. 25 at 1]. During the installation, the technician realized that an electrical outlet located directly next to circuit breaker panel had tripped repeatedly when he attempted to plug the new WiFi modem into it. [ECF No. 24-4 at 4]. He then called Mr. Darmore to the basement, who witnessed the circuit breaker tripping. [Id.] Within about ten minutes of the breaker tripping, Mr. Darmore heard smoke detectors alerting in the home. [Id.] He then looked throughout the first floor but could not identify a source of smoke. [Id.] He then went to the second floor; opened the access door to the attic above and immediately witnessed heavy smoke and heard the crackling of a fire. [Id.]; [ECF No. 25 at 1]. Mr. Darmore then called down to the Verizon technician; both immediately left the home, and then Mr. Darmore called 9-1-1. [ECF No. 25 at 1].[8]

The responding fire fighters extinguished the fire. [Id.] The resulting Burlington, Massachusetts Fire Department's report from the incident revealed, among other things that:[9]

- the responding fire fighters "found main fire to be over master bathroom ceiling fan[,]" and that

- Massachusetts State Police Trooper Kenneth Belben "determined fire started with bathroom vent fan . . . it was accidental. No connection to Verizon working on scene . . .."

---

[7] Investigators determined that the Verizon worker's action or inaction when installing the WiFi was not a factor to the fire. [ECF No. 24-4 at 28].

[8] Mr. Darmore and his spouse both later testified that they had each used the Fan earlier that morning and that neither experienced any abnormal conditions. [ECF No. 24-4 at 11]. Neither Mr. Darmore nor his spouse could recall whether the switch that controlled the Fan had been left on or off during the period between their use of the Fan and the discovery of the fire. [Id.]

[9] The report is written in all capital letters.

[ECF No. 24-4 at 5-9].

Mr. Darmore later timely submitted an insurance claim to Plaintiff related to the loss of real and personal property from the fire.  [ECF No. 1 ¶ 14].  In turn, Plaintiff made corresponding payments to him in the amount of $726,379.17. [Id. ¶ 15].

**b.  Procedural History**

Plaintiff's Complaint, [ECF No. 1], alleged the following causes of action against the Defendants:

| Count # | Cause of Action[10] | Named Defendant(s) |
|---------|---------------------|--------------------|
| I | Breach of Implied Warranty in Tort | Broan |
| II | Breach of Implied Warranty in Tort | Jakel |
| III | Negligence | Broan & Jakel |
| IV | Breach of Warranty | Broan & Jakel |

[ECF No. 1 at 3-6].

Following discovery, Defendants jointly filed the instant motion for summary judgment [ECF No. 23].  Plaintiff opposed, [ECF No. 25], and this Court then held an in-person hearing. [ECF No. 27].  Following the hearing, both parties filed brief, supplementary filings.  [ECF No. 28]; [ECF No. 29].  By electronic order, this Court **GRANTED** Defendants' summary judgment motion, [ECF No. 30], for the reasons that now follow.

**c.  This Court's Jurisdiction and the Applicable Substantive Law**

"Federal courts 'have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it.'"  Industria Lechera De P.R. v. Beiró, 989 F.3d 116, 120 (1st Cir. 2021) (citations omitted).  While neither party has raised this issue, the

---

[10] These are the labels that Plaintiff has used to describe his causes of action.

5

Court will briefly address whether it has subject matter jurisdiction over Plaintiff's claims -- all of which arise under Massachusetts law.

Plaintiff claims that this Court has diversity jurisdiction over the claims under 28 U.S.C. § 1332. [ECF No. 1 ¶ 8]. The Court will begin by determining whether the diversity of citizenship element is satisfied. Plaintiff is a Massachusetts corporation that has its principal office in Massachusetts, Broan is a Delaware Corporation with its principal office in Wisconsin, and Jakal is a Wisconsin corporation with its principal office in Wisconsin. Accordingly, the diversity of citizenship element is satisfied. See § 28 U.S.C. 1332(a)(1); [ECF No. 1 ¶¶ 1,4].

Further, the amount-in-controversy requirement is satisfied because Plaintiff has asserted that the damages-at-issue exceed $75,000 -- and are specifically equal to $726,379.17. [Id. ¶ 8]. Accordingly, the Court is satisfied that it has diversity jurisdiction over the action. Further, the undersigned notes that no party has challenged this Court's personal jurisdiction over them, and that venue is proper in this judicial district.

In terms of substantive law, it is common ground that Massachusetts supplies the rules of decision in this diversity suit, including the question of whether and to what extent expert evidence is required to prove up any of Plaintiff's claims. See, e.g., Sanders v. Phoenix Ins. Co., 843 F.3d 37, 42 (1st Cir. 2016); King v. Pierce Mfg., 608 Fed. Appx. 18, 19 (1st Cir. 2015) (unpublished) ("In a diversity action such as this one, 'whether expert testimony is required is a matter of state law.'") (citation omitted).

### d.  **Plaintiff's Claims**

As detailed in the table *supra*, Plaintiff's Complaint contained four causes of action. However, the parties' summary judgment briefing did not address these claims on a count-by-count basis, but instead the parties seem to tacitly agree that there were two species of claims: (1)

manufacturing defect theory claims sounding in both breach of implied warranty and negligence, and a (2) a design defect theory claims sounding in both breach of implied warranty and negligence. [See ECF No. 24]. The Court will follow the parties' lead[11] and therefore construes[12] Plaintiff's causes of actions as follows:

- **Count I**: a <u>Breach of Implied Warranty of Merchantability</u> claim against Broan under both a (i) manufacturing defect theory and (ii) a design defect theory.

- **Count II:** a <u>Breach of Implied Warranty of Merchantability</u> claim against Jakal under both a (i) manufacturing defect theory and (ii) a design defect theory.

- **Count III**: a <u>Negligence</u> claim against both Broan and Jakal under both (i) manufacturing defect theory and (ii) a design defect theory.

- **Count IV**: an <u>express warranty</u> claim against both Broan and Jakal.[13]

A brief note regarding the Court's interpretation of Count I and Count II. As another Session of this Court has explained:

> In Massachusetts, there is no strict liability cause of action for a defective product. Such a claim must be brought as a claim for breach of the implied warranties *of*

---

[11] <u>Cf.</u> <u>Bouchard v. GE Co.</u>, No. 1:14-cv-236-NT, 2015 U.S. Dist. LEXIS 154954, at *16 n.9 (D. Me. Nov. 17, 2015) ("The Plaintiff's Complaint consists of one count of 'Disability Discrimination/Failure to Accommodate.' I follow the parties' lead and treat this count as making out two separate claims of discrimination") (internal citations omitted); <u>Vazquez v. Andersen</u>, No. 18-cv-02645-STV, 2019 U.S. Dist. LEXIS 106012, at *26 n.8 (D. Colo. June 25, 2019) ("…Claims Four and Six appear to allege identical constitutional violations. As a result, the Court will follow the parties' lead and address the claims together").

[12] The Court always looks beyond the label of a cause of action to determine its true nature. <u>See e.g.</u>, <u>Brooks v. District of Columbia</u>, 375 F. Supp. 3d 41, 45 (D.D.C. 2019) ("[T]he Court looks through the form of the complaint to the substance of the allegations to determine the true nature of Plaintiffs' claims.")

[13] With Count IV, Plaintiff alleges in relevant part that, "[i]n supplying the bathroom exhaust fan, [D]efendants Broan and Jakel *expressly* and impliedly warranted that [the product] was fit for the ordinary purposes for which it was intended, and was of good and merchantable quality." [ECF No. 1 ¶ 27 (emphasis added)].

The Court concludes that, to the extent that Count IV also advances a breach of implied warranty of merchantability claim against both Broan and Jakal, those claims are wholly duplicative of Count I and Count II. <u>Vazquez</u>, 2019 U.S. Dist. LEXIS 106012, at *26.

*merchantability* and/or *fitness for a particular purpose* under Mass. Gen. Laws ch. 106, §§ 2-314 and 2-315, or of an express warranty under § 2-313.

Phillips v. Medtronic, Inc., 754 F. Supp. 2d 211, 216 (D. Mass. 2010) (citations omitted and emphasis added).

Here, however, neither Plaintiff's Complaint, [ECF No. 1], nor its opposition to Defendants' summary judgment motion, [ECF No. 25], indicate whether the Count I and Count II breach of implied warranty claims arise from an alleged breach of the implied warranty *of merchantability* and/or for an alleged breach of the implied warranty of *fitness for a particular purpose*, so the Court must resolve what type of claims are before it; construing the parties' pleadings to do justice. Fed. R. Civ. P. 8(e).

As Supreme Judicial Court has explained, "[u]nder the UCC,[14] a warranty that goods are merchantable is implied in a contract for their sale, if the seller is a merchant with respect to goods of that kind.  To be merchantable, goods must be "'fit for the ordinary purposes for which such goods are used.'"  Commonwealth v. Johnson Insulation, 682 N.E.2d 1323, 1326 (Mass. 1997) (citing Mass. Gen Laws. ch. 106, §§ 2-314 (1), (2) (c)).  Moreover, the UCC separately provides that "for an implied warranty of fitness for a particular purpose, which exists 'where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods.'" Id. (citing Mass. Gen Laws. ch.106, § 2-315).

Here, Plaintiff has certainly advanced breach of the implied warranty of merchantability claims, but nothing in the Complaint, [ECF No. 1], nor in the summary judgment record indicates that Plaintiff has asserted a claim for breach of the implied warranty of fitness for a particular purpose.  [See ECF No. 25].  Accordingly, the Court construes Count I and Count II as *only*

---

[14] The Uniform Commercial Code ("UCC").

containing claims for breach of the implied warranty of merchantability, and further finds that to the extent that Plaintiff intended to advance any breach of the implied warranty of fitness for a particular purpose, those claims are deemed waived.  See e.g., Brooks, 375 F. Supp. 3d at 45. "Failure to allege that the product had a particular purpose that differed from the purpose for which it was ordinarily used is fatal to stating a viable claim." Courtemanche v. Motorola Sols., Inc., 774 F. Supp. 3d 289 (D. Mass. 2025). Plaintiff's failure to allege another purpose that is "separate and apart from this ordinary purpose" renders its claim insufficient. Id.; see Taupier v. Davol, Inc., 490 F. Supp. 3d 430, 444 (D. Mass. 2020) (holding that because plaintiff "failed to allege that he used [the product] at issue for a purpose that differed from the purpose for which it was ordinarily used, the complaint falls short of state a viable claim.")

## III.    Legal Standards

### a.    Summary Judgment

Summary judgment is appropriate when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. Morris v. Gov't Dev. Bank, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it may affect the outcome of the suit. Id.

At the summary judgment stage, the Court must view the record in the light most favorable to the non-moving party and must "indulge all reasonable inferences" in their favor.  Martins v. Vt. Mut. Ins. Co., 662 F. Supp. 3d 55, 64 (D. Mass. 2023) (citing O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993)).  In the first instance, the moving party "bears the burden of

demonstrating the absence of a genuine issue of material fact[.]" <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st Cir. 2000) (citations omitted).  If a properly supported summary judgment motion is presented, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial," and may not simply "rest upon mere allegation or denials of [their] pleading," but must instead "present affirmative evidence[.]" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250, 256–57 (1986).  "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." <u>Walsh v. Town of Lakeville</u>, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

"Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." <u>Magee v. United States</u>, 121 F.3d 1, 3 (1st Cir. 1997) (citation omitted).

**b. <u>Fed. R. Civ. P. 26(a)(2)(B)</u>**

As a general matter, Federal Rule of Civil Procedure 26 requires parties in civil cases to disclose their witnesses. Rule 26(a)(2) of the Federal Rules of Civil Procedure provides that the disclosure of an expert witness "must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B).  More specifically, Rule 26(a)(2)(B) requires that the disclosure of any witness "retained or specially employed to provide expert testimony" shall include a written report prepared and signed by the expert witness which "must contain[,]" among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them[.]"

Fed. R. Civ. P. 26(a)(2)(B)(i). Moreover, the proponents of such experts have an ongoing duty to "supplement" their initial disclosure to alert opposing parties of any subsequent "additions or changes" to the content of the expert's testimony.  Fed. R. Civ. P. 26(e)(2).  At the same time, Federal Rule of Civil Procedure 37(c)(1), provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

As other federal courts have explained, this legal framework has been interpreted to mean that expert witnesses generally cannot supplement or otherwise amend their opinions during post-report publication depositions.  See e.g., Danmark v. CMI USA, Inc., No. 13-cv-00457-JST, 2014 U.S. Dist. LEXIS 171056, at *3 n.1 (N.D. Cal. Dec. 9, 2014) ("The Rule [Rule 26(a)(2)(B)] itself and the law inte[r]preting it are clear that an expert's report must contain a *complete* statement of the expert's opinions and the reasons for them be contained *in the expert report*, and that subsequently-given deposition testimony is not a substitution for adequate disclosure in the expert's original report…") (citation omitted); V5 Techs., LLC v. Switch, Ltd., No. 2:17-cv-02349-KJD-NJK, 2020 U.S. Dist. LEXIS 219656, at *6-7 (D. Nev. Nov. 18, 2020) ("[Plaintiff] is correct that Swarts's [(an expert witness-accountant)] deposition opinion regarding the failure of [plaintiff's] executives to live in Las Vegas is impermissible.  An expert report must contain 'a complete statement of all opinions the witness will express and the basis and reasons for them.' Fed. R. Civ. P. 26(a)(2)(B)(i).  This testimony is outside the scope of Swarts's report and [defendant] **has made no attempt to prove the failure to disclose was harmless or substantially justified . . . .**") (citation omitted); Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp., No. 05-80183-CIV-SEITZ/MCALILEY, 2006 U.S. Dist. LEXIS 97276, at *4-5 (S.D. Fla. Oct. 5, 2006)

(explaining that "Federal Rule of Civil Procedure 26(a)(2) helps make the deposition a meaningful exercise by mandating, among other things, that the proponent of the expert provide a detailed expert report in advance of the deposition . . . .The purpose of Rule 26(a)(2) is to prevent unfair surprise and to allow the opposing party to meaningfully depose the expert and prepare rebuttal reports[.]") (citation omitted).

Under Rule 37(c)(1), incomplete or late disclosures may result in (among other possible sanctions) the preclusion of the "relevant expert information . . . 'at a hearing, or at a trial, unless the failure was substantially justified or harmless.'" Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 77 (1st Cir. 2009). In making this sanction decision, a court should consider "the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects," as well as "[s]uprise and prejudice." Macaulay v. Anas, 321 F.3d 45, 51 (1st Cir. 2003) (citing Thibeault v. Square D Co., 960 F.2d 239, 244 (1st Cir. 1992); Johnson v. H.K. Webster, Inc., 775 F.2d 1, 7-8, 7 n.7 (1st Cir. 1985)).

## IV.    Analysis

### a.    Threshold Question: Did Plaintiff Violate Fed. R. Civ. P. 26(a)(2)(B)?

Applying the legal standard described *supra*, the Court finds that Plaintiff violated Rule 26(a)(2)(B) relative to the Engineer Expert in three specific ways. The Court will briefly describe the grounds for this violation finding before announcing the appropriate sanction.

First, neither of the Engineer Expert's two reports in this case (i.e., his opening report, [ECF No. 24-5] nor his rebuttal report, [ECF No. 24-6]) disclose a specific, alleged manufacturing defect, and yet the Engineer Expert disclosed one for the first time at his deposition. [ECF 25-2 at11-12]. As discussed in greater detail *infra*, under Massachusetts law, a manufacturing defect

"occurs when a product differs from identical products issued from the same manufacturer[,]"
Wasylow v. Glock, Inc., 975 F. Supp. 370, 377 (D. Mass. 1996) (citation omitted), and, although
expert testimony is not required in every case, the existence of a defect typically "cannot be
inferred in the absence of expert testimony." Enrich, 616 N.E.2d at 1084.

Here, a close reading of both expert reports reveals that neither articulates an alleged
manufacturing defect with sufficient specificity. [See ECF No. 24-5]; [ECF No. 24-6]. Indeed, in
its opposition to Defendants' summary judgment motion, [ECF No. 25], Plaintiff was unable to
direct the Court to a specific section of either of the Engineer Expert's reports that clearly identified
a manufacturing defect. [See ECF No. 25 at 3-7]. Instead, Plaintiff directed the Court to certain
testimony that the Engineer Expert gave at his deposition, which occurred nearly one month after
the date of his rebuttal report. [Id. at 5]. Further, the Engineer Expert does not appear to have
produced a supplemental report containing these newly disclosed opinions regarding an alleged
manufacturing defect despite an obligation to have done so. Fed. R. Civ. P. 26(a)(2)(B).

Second and relatedly, the Court finds that neither of the Engineer Expert's reports
sufficiently disclosed the opinions he presented for the first time at deposition regarding *how* any
alleged manufacturing defect *caused* the fire insured premises -- an essential element of a breach
of implied warranty claim. Lally v. Volkswagen Aktiengesellschaft, 698 N.E.2d 28, 43 (Mass.
App. Ct. 1998); [see ECF No. 24-5; ECF No. 24-6]. In the face of this challenge, Plaintiff first
directed the Court to a paragraph of the Engineer Expert's opening report which stated that:

> The presence of electrical activity on the motor coil, but nowhere else in the fan supply
> wiring, not only confirms that the fan was energized at the time of the fire but also precludes
> any damage inside the fan from having been caused by external fire attack. A fire attacking
> the fan from outside would necessarily cause the insulation on the wiring supplying power
> to the fan to fail before attacking the motor coil and thereby remove power from the motor
> coil. Thus, any electrical failures in other wiring in the attack are the result of the fire
> originating at the fan spreading out and attacking that wiring. As mentioned above, the burn
> patterns show a fire originating at the area of the fan. The only wiring in the area of the fan

is the section of wiring that was examined at the aforenoted examination. Thus, the possibility of a fire originating at any other wiring can be eliminated.

ECF No. 25 at 5.

However, after careful analysis of this paragraph, the Court concludes that it does not sufficiently disclose an expert opinion regarding how an alleged manufacturing defect caused the fire but is instead merely an argument about *what did not cause* the fire. Thus, after reviewing the Engineer Expert's reports, Defendants were only able to speculate about Plaintiff's manufacturing defect causation arguments and were thus not able to meaningfully prepare for deposition on this point.

Plaintiff also directed the Court to sections of the Engineer Expert's deposition testimony, arguing that he had repeatedly opined that "the fire was caused by a manufacturing defect in the TCO, which provided inadequate thermal protection to prevent the motor coil from reaching temperatures that could ignite a fire." [Id.] Although the Engineer Expert did so testify at his deposition, [see ECF No. 25-2], the Court agrees with the Defendants that neither of his reports contain a sufficiently adequate opinion on causation and further finds that he did not supplement his report after his deposition with these previously undisclosed opinions.

Third, the Court finds that neither of the Engineer Expert's reports disclosed his opinion, presented for the first time at deposition, regarding allegedly available design modifications and/or the potential costs and performance interference issues associated with adopting such modifications -- a necessary element of a design defect claim. See e.g., Catatao v. Sig Sauer, Inc., No. 22-10620-PBS, 2024 U.S. Dist. LEXIS 158259, at *6 (explaining that a plaintiff asserting a design defect claim must, among other things, "prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented" his injury) (internal quotation marks and citation omitted); Uloth v. City Tank Corp., 384 N.E.2d 1188, 1193 (Mass.

1978) ("[T]here is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery.")

In response to this line of attack, Plaintiff directed the Court only to aspects of the Engineer Expert's deposition testimony; effectively conceding that neither of his reports disclosed an opinion on available design modifications.

With respect to the failure to disclose either of these three, critically important pieces of expert testimony, Plaintiff has made no attempt to prove that the failure to disclose these opinions was harmless or was substantially justified. Further, the Court finds that the failure to do so unfairly surprised[15] Defendants and prevented the Engineer Expert's deposition from being fully meaningful relative to at least these three areas of inquiry. Accordingly, the Court finds that Plaintiff violated Rule 26(a)(2)(B) with respect to these three significant aspects of the Engineer Expert's testimony. See e.g., Prouty v. Thippanna, 541 F. Supp. 3d 131, 135 (D. Mass. 2021) (quoting Lohnes v. Level 3 Comm., Inc., 272 F.3d 49, 60 (1st Cir. 2001)) (explaining that "[c]omplete and timely disclosures and supplementation ensure an even playing field, preventing any party from gaining an 'unfair tactical advantage' at trial . . . "); Therrien v. Hearst TV, Inc., No. 23-10998-RGS, 2025 U.S. Dist. LEXIS 27051, at *10 (D. Mass. Feb. 14, 2025) ("[t]o permit Therrien to ambush the defendant with a previously undisclosed expert report of a previously unidentified witness would 'undermine[] the purpose of setting deadlines for expert disclosures; those deadlines must have some force if the courts are to be able to manage their dockets in any meaningful way…'") (citations omitted).

---

[15] The Court's finding of unfair surprise is further supported by the fact that Plaintiff's answers to Defendants' interrogatories regarding any alleged manufacturing defect merely cited to its expert witnesses' disclosures. [See ECF No. 24-1 at 3-6; ECF No. 24-2 at 2-3].

In terms of the sanction that should result from this tripartite violation, the Court finds that precluding these three aspects of the Engineer Expert's testimony is most appropriate. Since the first two violations relate to essential elements of Plaintiff's manufacturing defect claim and the third relates to an essential element of Plaintiff's design defect claim, the Court finds that summary judgment should enter in favor of Defendants on this basis alone. Crawford-Brunt v. Kruskall, 489 F. Supp. 3d 4, 9 (D. Mass. 2020).

However, in the interest of completeness, the Court will nevertheless address the merits of each of Plaintiff's claims as they present, had the Court not precluded these three aspects of the Engineer Expert's testimony.

### b. Counts I and II: Breach of Implied Warranty of Merchantability Claims Against Broan and Jakal (Under Both a Manufacturing Defect Theory and a Design Defect Theory)

#### i. Legal Landscape

Under Massachusetts products-liability law, claims for breach of implied warranty are functionally equivalent to strict liability claims in other jurisdictions. See e.g., Commonwealth v. Johnson Insulation, 682 N.E.2d 1323, 1326 (1997) ("Liability under this implied warranty is 'congruent in nearly all respects with the principles expressed in the RESTATEMENT (SECOND) OF TORTS § 402A (1965)'" (quotation omitted). By statute, the implied warranty of merchantability requires that goods be "fit for the ordinary purposes for which such goods are used[.]" Mass. Gen. Laws ch. 106, § 2-314. As the SJC has explained, the "ordinary purposes" contemplated by this statutory provision "include both those uses which the manufacturer intended and those which are reasonably foreseeable." Back v. Wickes Corp., 378 N.E.2d 964, 969 (Mass. 1978) (citation omitted).

To prove a breach of implied warranty, a plaintiff must show, among other things, "a defect in the product or an unreasonably dangerous condition which existed at the time the product left the [manufacturer's] control." Enrich v. Windmere Corp., 616 N.E.2d 1081, 1085 (1993) (citation omitted). In this context, a product "may be defective and unreasonably dangerous because of a *manufacturing defect, a design defect*, or a warning defect[.]" Evans v. Lorillard Tobacco Co., 990 N.E.2d 997, 1010 (2013) (citing Restatement (Third) of Torts: Products Liability § 2, at 14 (1998) (emphasis added)).[16] Although not a bright line rule, the existence of a defect typically "cannot be inferred in the absence of expert testimony." Enrich, 616 N.E.2d at 1084 (citations omitted); Esturban v. Mass. Bay Transp. Auth., 865 N.E.2d 834, 835 (Mass. App. Ct. 2007) (concluding that expert testimony was required to prove the narrowness of an escalator that allegedly caused plaintiffs' injuries, since "an escalator is a complex, technical piece of machinery, whose design and operational requirements are not straightforward[,]" "generally beyond the scope of an average person's knowledge . . . ") (citations omitted).

To prevail on breach of implied warranty of merchantability claim, a plaintiff must show that: (1) defendant manufactured or sold the subject product, (2) that product contained a defect or unreasonably dangerous condition rendering it unsuitable for its ordinary use, (3) plaintiff was using the product in a manner that defendant intended or reasonably could have foreseen, and (4) the defect or dangerous condition was a legal cause of plaintiff's injury. Lally, 698 N.E.2d at 43.

A manufacturing defect "occurs when a product differs from identical products issued from the same manufacturer." Wasylow v. Glock, Inc., 975 F. Supp. 370, 377 (D. Mass. 1996) (citation omitted). Thus, to establish the existence of a manufacturing defect, a plaintiff must demonstrate "that there is a 'deviation from the design [that] rendered the product unreasonably dangerous and

---

[16] As noted *supra*, Plaintiff has pursued both a manufacturing defect theory and a design defect theory.

therefore unfit for its ordinary purposes.'" <u>Burnham v. Wyeth Labs., Inc.</u>, 348 F. Supp. 3d 109, 112 (D. Mass. 2018) (citation omitted).  Indeed, in a manufacturing defect case, the factfinder must "compare the propensities of the product as sold with those which the product's designer intended it to have" and determine "whether the deviation from the design rendered the product unreasonably dangerous and therefore unfit for its ordinary purposes." <u>Back v. Wickes Corp.</u>, 378 N.E.2d 964, 970 (1978).

A design defect occurs if the product is "defective and unreasonably dangerous…for the ordinary purposes for which it is fit." <u>Haglund v. Philip Morris, Inc.</u>, 847 N.E.2d 315, 322 (internal quotation marks and citation removed). To prove a design defect, a plaintiff must show that the entire product line is defective, not just the specific unit at issue. <u>Pub. Serv. Mut. Ins. v. Empire Comfort Sys., Inc.</u>, 573 F. Supp. 2d 372, 380 (D. Mass. 2008).  Relatedly, a "plaintiff must demonstrate that the defect was present at the time the product was sold and that the defect caused the plaintiff's injury." <u>Liberty Mut. Ins. Co. v. Broan-NuTone LLC</u>, 731 F. Supp. 3d 205, 219 (D. Mass. 2024) (citing to <u>Haglund</u>, 847 N.E.2d at 322; <u>Enrich</u>, 616 N.E.2d at 1084. Furthermore, a plaintiff alleging a defective design must "prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented" his injury. <u>Catatao</u>, 2024 U.S. Dist. LEXIS 158259, at *6 (internal quotation marks and citation omitted); <u>see also</u> <u>Ducat v. Ethicon, Inc.</u>, 534 F. Supp. 3d 152, 158 (D. Mass. 2021); <u>Evans v. Lorillard Tobacco Co.</u>, 990 N.E.2d 997, 1014 (Mass. 2013).

### ii.    <u>Was Expert Testimony Required?</u>

The Court easily concludes that given the complexity of the product at issue in this case, expert testimony was required relative to both the manufacturing defect theory and the design defect theory. <u>See e.g.</u>, <u>Enrich</u>, 616 N.E.2d at 1084 (concluding that plaintiffs could not

demonstrate that an electrical fan was defectively designed without expert testimony even where the fan was implicated in a fire).

### iii.    <u>Application – Manufacturing Defect Theory</u>

The Court finds that summary judgment must enter in favor of Defendants on Plaintiff's manufacturing defect theory claims for two independently sufficient reasons.  <u>First</u>, Plaintiff has failed to establish the existence of a manufacturing defect in the actual product sold, which is a requirement under Massachusetts law.  <u>Lally</u>, 698 N.E.2d at 43. Nothing in the summary judgment record suggests that the *particular Fan/Motor installed at the insured premises* deviated from its intended design such that it was rendered unreasonably dangerous and therefore unfit for ordinary purposes.  <u>See e.g.</u>, <u>Burnham v. Wyeth Labs., Inc.</u>, 348 F. Supp. 3d 109, 112 (D. Mass. 2018) (citation omitted).

At deposition, Plaintiff's Engineer Expert testified that there were three "deficiencies" with the Fan, generally, that have allegedly been identified by other industry commentators, [ECF No. 24-7, 19:3-21:10], but at no point did he proffer testimony regarding how the Fan/Motor that were actually sold deviated from their intended design such that the Court could infer the existence of a manufacturing defect.  Indeed, the Engineer Expert conceded that he had not personally conducted any testing on any "fan motors," and he acknowledged that the *only* basis for concluding that the TCO in the Fan/Motor in question failed was by analyzing "the damage pattern to the fan," which allegedly showed that the "the motor coil overheated." [<u>Id.</u> 22:23-25:15; 63:8-20].  The failure to identify a specific, alleged manufacturing defect means that no factfinder would be able to perform their duty to "compare the propensities of the product as sold with those which the product's designer intended it to have" to determine "whether the deviation from the design rendered the

product unreasonably dangerous and therefore unfit for its ordinary purposes." Back v. Wickes Corp., 378 N.E.2d 964, 970 (Mass. 1978).

Second, summary judgment must enter in favor of Defendants because no reasonable jury could conclude that a manufacturing defect *caused* the fire at the insured premises. As explained *supra*, expert testimony was necessary required for Plaintiff to advance its manufacturing defect claims. However, on the question of causation, Plaintiff's Engineer Expert conceded at deposition ***that he did not know*** whether the alleged manufacturing defect that he identified caused the fire. Said differently, even if Plaintiff had articulated a manufacturing defect with requisite specificity, it failed to introduce evidence from which a jury could do anything but speculate regarding whether that defect actually caused the fire. The following exchange from the Engineer Expert's deposition reveals this evidentiary deficiency.

**Q:** Do you know one way or the other whether the bend in the TCO caused the TCO not to function as it was supposed to function?

**A:** I do not.

[ECF No. 24-7, 103:7-17].

In sum, the lack of expert testimony regarding causation is fatal to Plaintiff's manufacturing defect claims. Summary judgment must enter in favor of Defendants on the manufacturing defect theory claims.

### iv.    **Application – Design Defect Theory**

Summary judgment must enter in favor of Defendants on Plaintiff's design defect claims because Plaintiff has failed to elicit any evidence from which a reasonable jury could conclude that there exists "an available design modification which would reduce the risk *without undue cost or interference with the performance of the machinery*." See Uloth, 384 N.E.2d at 1193 (emphasis

added).  When the Engineer Expert was questioned at deposition about whether he proposed alternative design modifications would be unduly costly and/or would interfere with performance, he not only testified his proposed modifications would result in the size and other characteristics being different from the status quo product, he also stated that he had no information regarding cost differentials, other than his proposed modifications would lead to a more expensive product. The following exchange from his deposition highlight the evidentiary deficiency on this element of Plaintiff's claim.

> **Q:** Do you have any information regarding a difference in cost between the fractional horsepower shaded-pole motor and the totally enclosed motor that you're referring to?
>
> **A:** First of all, I don't know that the other one I'm referring to isn't also a shaded - - a fractional horsepower shaded-pole motor, ***but I don't know the cost differences.***
>
> **Q:** Do you know whether the size of the motors would be the same?
>
> **A:**  They'll be different.
>
> **Q:** And would the other characteristics of the motor also be different?
>
> **A:** Yes.  Yeah.  The –
>
> **Q:**  Not just the enclosure, but the operating characteristics would be different?
>
> **A:** Sure.  Yeah.  The amount of air that can move, things like that.  Yeah.  Would be different.

[ECF No. 110:22-111:20].

This exchange clearly shows that a trial jury would be left guessing regarding whether the proposed design modification would be unduly costly and/or would affect performance of the machinery.  Since no reasonable jury could find in favor of Plaintiff on this essential element, summary judgment must enter in favor of Defendants on the design defect claims.

### c.  __Count III: Negligence Claims Against Broan and Jakal (Manufacturing Defect Theory & Design Defect Theory)__

As another court in this District has recently observed, "[t]o prevail on either a negligence or breach of warranty claim, the plaintiff must present evidence of a defect."  Liberty Mut. Ins. Co. v. Broan-NuTone LLC, 731 F. Supp. 3d at 220 (citing Netherlands Ins. Co., 646 F. Supp. 3d 139, 146 (D. Mass. 2022)).  As discussed above, Plaintiff lacks admissible evidence to show either a design defect or a manufacturing defect, and even if its late-disclosed evidence was admissible, it is insufficient.  Consequently, Plaintiff cannot succeed on its negligence claims, see id., and therefore summary judgment must enter in favor of Plaintiff on Count III.

### d.  __Count IV: Breach of Express Warranty Claims Against Broan and Jakal__

To the extent that it asserts a Breach of Express Warranty claim against either or both Defendants, that claim is deemed waived since the Plaintiffs did not brief it[17] and because nothing in the summary judgment record indicates that either of Plaintiff's experts provided sufficient evidence to show a triable issue of material fact as to a breach of any express warranty.  Fed. R. Civ. P. 56(e).  Accordingly, summary judgment must enter in favor of Defendants on Count IV.

## V.    __CONCLUSION__

For the forgoing reasons, Defendants' motion to for summary judgment, [ECF No. 23], was __GRANTED__ as to all counts, [ECF No. 30].

   __SO ORDERED.__

---

[17] See e.g., Connelly v. City of St. Albans, No. 2:21-cv-00291, 2024 U.S. Dist. LEXIS 81150, at *55 (D. Vt. May 3, 2024) ("'[D]istrict courts frequently deem claims abandoned when counseled plaintiff's fail to provide arguments in opposition[,]' a practice that has been 'expressly approved…in the context of summary judgment motions[.]'") (citations omitted); Eiland v. Blagburn, No. 3:05-CV-459-WKW (WO), 2007 U.S. Dist. LEXIS 74762, at *36-37 (M.D. Ala. Oct. 5, 2007) ("A plaintiff abandons a claim if the plaintiff fails 'to list an enumerated claim and brief an issue in a memorandum of law in opposition to a defendant's motion for summary judgment'") (citations omitted).

Dated: August 6, 2025

                                                                   /s/ Margaret R. Guzman
                                                                    Margaret R. Guzman
                                                                   United States District Judge